145 F.3d 389
 330 U.S.App.D.C. 262
 MUTUAL OF OMAHA INSURANCE COMPANY and Union Labor Life
Insurance Company, Appellees,
v.
NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC., et al., Appellants,
Office of Personnel Management and Constance J. Horner, in
her official capacity as Director of OPM, Appellees.
 No. 97-5129.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 10, 1998.
Decided June 23, 1998.
Rehearing Denied Sept. 4, 1998.
 
 [330 U.S.App.D.C. 263] Appeal from the United States District Court for the District of Columbia (88cv0516).
 Denis F. Gordon argued the cause for appellants with whom Brad W. Spencer was on the briefs. James R. Barnett entered an appearance.
 Dara A. Corrigan, Assistant United States Attorney, argued the cause for appellees Office of Personal Management and Constance J. Horner, with whom Wilma A. Lewis, United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, were on the brief. John D. Bates, Assistant United States Attorney, entered an appearance.
 William O. Bittman argued the cause for appellees Mutual of Omaha Insurance Company and Union Labor Life Insurance Company, with whom Michael Barrett was on the brief. James S. Ray entered an appearance.
 Before: SILBERMAN, HENDERSON, and ROGERS, Circuit Judges.
 SILBERMAN, Circuit Judge:
 
 
 1
 The National Association of Government Employees (the Union or NAGE) appeals from a district court order "extinguishing" its claim for money contained in a contingency reserve fund maintained by the Office of Personnel Management (the Office or OPM). The district court lacked jurisdiction to make this determination--and may well have lacked jurisdiction over the whole case--thus we vacate its order.
 
 I.
 
 2
 The Federal Employee Health Benefits Act establishes a subsidized health insurance program for civilian employees and annuitants of the federal government. Carriers contract with OPM, the agency that oversees the program, to provide health insurance to those who choose to enroll. As an "employee organization," the Union qualified as a "carrier" under the statute, 5 U.S.C. § 8903(3) (1994), and it contracted with the Office to sponsor a health insurance program for its members. That contract subjected all disputes arising under it to the jurisdictional limitations of the Contract Disputes Act. By [330 U.S.App.D.C. 264] subcontract, Mutual of Omaha Insurance Company (Mutual) and Union Labor Life Insurance Company (Union Labor or ULLICO) underwrote the plan during successive periods. The Office maintains a "contingency reserve fund" comprised of three percent of the plan's total contributions for each plan established under the Act. When a plan's costs exceed its annual income, the carrier may apply for a special transfer from this surplus account. 5 C.F.R. § 890.503(c)(5) (1998).[1]
 
 
 3
 After suffering approximately $17.5 million in losses during its underwriting period, Mutual applied to the Office for a special transfer from the NAGE plan's contingency reserve fund. The Office refused to consider the application, taking the position that only the Union, the party with whom it contracted, qualified as a "carrier" of the plan. Mutual then sued both the Office and the Union, but ultimately dropped its claims against the Union in a 1990 settlement agreement. Union Labor, afraid that Mutual's claims would deplete the contingency reserve, intervened as a plaintiff in the lawsuit to recover losses it had incurred underwriting the NAGE plan.
 
 
 4
 Two days before trial, the parties settled. They recorded the agreement in front of the district court on August 9, 1995:
 
 
 5
 Mr. Kozma (Counsel for ULLICO): [W]e all understand that Mr. Haynes [Assistant U.S. Attorney] has to get his approvals and all of that, but with everybody's concurrence, I will go ahead and state the settlement as I understand it.
 
 
 6
 O.P.M. has agreed to pay out $17,450,000 out of the contingency reserve fund. Of that amount, four-million will go to Mutual of Omaha. The balance will come to Union Labor Life Insurance Company.
 
 
 7
 We have agreed that the payment should be within forty-five days. That is subject to O.P.M. using--O.P.M. and the U.S. Attorney using their best efforts to obtain approval and arrange for the payment within that time period.
 
 
 8
 We would like to see the money as soon as possible, obviously.
 
 
 9
 All claims against all parties will be dismissed. No party receives any fees or costs. Each party bears their own fees and costs.
 
 
 10
 And that's pretty much my understanding.
 
 
 11
 Mr. Spencer: Your Honor, Brad Spencer for NAGE.
 
 
 12
 That will include the claims against NAGE which we bifurcated for a separate trial.
 
 
 13
 The Court: I understand.
 
 
 14
 Mr. Spencer: This will wipe this case off the docket.
 
 
 15
 The Court: All right.
 
 
 16
 Mr. Kozma: That's correct.
 
 
 17
 Mr. Haynes: Your Honor, Fred Haynes for the government.
 
 
 18
 The only disagreement I have with what Mr. Kozma said is that we agreed to pay--and obviously, I would prefer we not get into this, but since your honor has said we should, I am doing it.
 
 
 19
 We have agreed to pay 2.2 to Mutual--million--and the remainder to ULLICO.
 
 
 20
 Now, they have requested that we try to arrange [sic] four-million direct payment to Mutual. We're going to look into that, but it has to be with the understanding that only 2.2 million is going from us to Mutual.
 
 
 21
 I won't bore you with the reason why this is significant, but it is significant to us. And we agreed to 2.2 million to Mutual and the remainder to ULLICO.
 
 
 22
 Mr. Kozma: We don't dispute that, your Honor.
 
 
 23
 The Court: And were no more than 2.2 million to go from O.P.M. to Mutual, then the payment would be made by ULLICO from the sum that it had been given.
 
 
 24
 Mr. Kozma: We will make some arrangements to get the money--
 
 
 25
 The Court: To Mutual?
 
 
 26
 Mr. Kozma: Yes.
 
 
 27
 And I would also like to say that I have already begun drafting a settlement agreement, which I will circulate. It's the parties' intention to reduce all of this to a [330 U.S.App.D.C. 265] settlement agreement that will be executed.
 
 
 28
 Because the contingency reserve fund had grown through interest accruals, the parties were aware that the payments to Mutual and Union Labor would not completely empty it.
 
 
 29
 On August 11, 1995, Kozma circulated a draft agreement to all of the parties. That afternoon, counsel for the Union called Kozma and objected to the language in paragraphs 4 and 14 of the draft.[2] Paragraph 4 said: "The NAGE defendants shall receive none of these funds," and paragraph 14 said:
 
 
 30
 This Agreement constitutes a full and complete release by each of the parties in favor of each of the other parties of all claims or liabilities that were or could have been asserted in this action, and of all claims and liabilities arising from or out of the NAGE plan, its operation and administration from 1985 to the present, except as set forth in this Agreement.
 
 
 31
 The Union's counsel thought this language was overbroad and could be read to preclude the Union from seeking reimbursement from the Office for an unrelated claim dealing with expenses it incurred paying the final claims made after the plan closed. He suggested changes that would clarify that nothing in the settlement barred the Union from making such a claim in the future.
 
 
 32
 Kozma, however, never communicated the Union's concerns to the other parties. On September 20, 1995, Kozma, joined by counsel for Mutual, wrote to the Deputy Attorney General of the United States seeking to expedite the government's approval of the settlement. Despite the Union's objections, this letter stated that "by August 18, all parties had approved the [August 11] draft except DOJ." To make matters worse, in what Kozma later described as an "oversight," the letter was sent to everyone involved in the suit except the Union. Kozma said that he just hadn't thought that the Union's concern was material. To be sure, the Union had no claims in the suit and was not paying anyone else's claims. Indeed, it was asked to leave the room for substantial periods during the settlement negotiations so that counsel for all parties other than the Union could conduct private discussions.
 
 
 33
 On October 10, all parties appeared before the district court, and Assistant U.S. Attorney Haynes announced that he expected final Justice Department approval by the end of the day. Two days later, when Kozma circulated a second draft, the Union realized that its comments had been ignored. The Union's lawyer immediately called Kozma, who told him to take up his problems directly with the government.
 
 
 34
 Accordingly, on October 17, the Union submitted a closeout accounting statement to the Office requesting approximately $600,000 from the contingency reserve fund as reimbursement for expenses incurred during the claims run-off period. Immediately, a furor erupted. In court that morning, Haynes said that the government had entered into the agreement with the understanding that it could use the remaining reserve money for other plans under the Health Benefits Act. Counsel for the Union asserted that, as a defendant in the suit, it did not have a claim subject to the settlement and did not perceive the agreement to waive any of its potential claims. The district court gave the parties a week to sort out the conflict.
 
 
 35
 All counsel drafted affidavits setting forth their recollection of the settlement negotiations. According to Kozma, OPM officials had expressed concern early in the negotiations that no close-out accounting statement had been submitted for the NAGE plan. Yet though the statement--and any accompanying request for reimbursement--remained outstanding, the government made no attempt to secure a waiver from the Union. Haynes admitted that he did not "specifically recall" the Union agreeing to a waiver. He nevertheless insisted that the Office had perceived itself to be entering a "global settlement." [330 U.S.App.D.C. 266] The government's self-serving perception appears to be based more on wish fulfillment (and fear of embarrassment) than on hard facts. As Kozma explained, "The settlement discussions concerned only the claims made in this action. At no time did the NAGE defendants mention any new claim against the contingency reserve. Conversely, at no time did the OPM defendants request a release from any party going beyond the claims made in this action." Similarly, counsel for Mutual said, "At all times, the settlement discussions concerned only the resolution of claims that had been brought in this lawsuit ... [a]t no time did the settlement discussions ever concern the release of claims that had not been brought and could not have been brought in this lawsuit regarding the NAGE Plan's contingency reserve." Counsel for both insurance companies agreed that the Union's claim could not have been brought in this lawsuit because it would have been subject to the Contract Disputes Act, which deprives district courts of jurisdiction over certain contract claims against the federal government.
 
 
 36
 Mutual and Union Labor filed a joint motion to enforce the settlement agreement, and the district court ordered the Union to show cause why it should not be bound. On December 12, 1995, the district court issued an order (drafted by Mutual and adopted wholesale) enforcing the settlement and "extinguishing" the Union's claims. In this order, the court found that the Union's silence regarding its claim "estopped" it from asserting that it did not agree to the settlement. When it finally ruled on the Union's motion to amend the judgment--two years later--the court, clarifying its earlier order, said that the language of estoppel did not mean that the Union had consented to the contract. The following interchange took place between the government's counsel and the district court:
 
 
 37
 Mr. Haynes: Your Honor, I interpreted your estoppel language as being--as falling in that area of contract law where they say that you can be bound to a contract by silence--by conduct. We certainly argue that they were bound to the settlement.
 
 
 38
 The Court: That is an argument for you to make before O.P.M.
 
 
 39
 Mr. Haynes: Well, I can tell you, Your Honor, that O.P.M. is not going to pay their claim, because it's our view that we entered into a global settlement. And I think we went through this. I don't want to go over what we have been through, but we thought we had a global settlement. Now, they are trying to carve out their part of it so that we end up the loser, because we paid out $17,500,000.00 to the plaintiffs on the assumption that we would get the rest of it. Now they come to us, after the agreement is reached, and say, "No, you don't get that. You have to give us a good part of it."
 
 
 40
 So we feel as though there was an agreement. They are bound by their silence--by their conduct, and that Your Honor correctly extinguished their claims, but on the basis that they were part of the contract.
 
 
 41
 Thank you, Your Honor.
 
 
 42
 The Court: But I did not find that they were a party to the contract. (Emphasis added.)
 
 II.
 
 43
 This is an extraordinary case. The government fiercely defends the district court's determination that the Union is bound to the settlement, but does not produce any evidence or real legal theory to support its claims. Although the government reiterates the "view" of its counsel below that it entered into a "global settlement," which presumably picked up the Union through its gravitational pull, we gained the impression that the government believes the Union is also guilty of lese majeste because the government's lawyers were not told of the Union's objections until after the Assistant United States Attorney had received the Deputy Attorney General's blessing of the settlement. Consistent with its global settlement claim, the government contends that there can be no agreement between it and the insurance companies if the Union prevails. The insurance companies, for their part, treat the Union like the proverbial skunk at the garden party, but insist [330 U.S.App.D.C. 267] that whatever happens to the Union, the government is bound.
 
 
 44
 Recognizing that the district judge did not find it a party to the settlement agreement (and discounting the estoppel notion as without legal support), the Union reasons that the district court's determination must have been a ruling on the merits of its claim against the contingency reserve. It argues that the district court lacked subject matter jurisdiction to make that determination because the Union's claim is covered by the Contract Disputes Act. The government does not dispute that the Contract Disputes Act, see 41 U.S.C. § 602(a) (1994), would apply to any claim arising under the NAGE policy. Such claims can only be resolved by the "contracting officer," id. § 605(a) (1994), and appealed to either an agency board of contract appeals or the United States Court of Federal Claims. Id. § 606 (1994); § 609 (1994).
 
 
 45
 The Union's jurisdictional argument raised for us the question whether the district court lacked jurisdiction over the entire case. If the insurance companies' claims are predicated on the Union's policy, they too might be covered by the Contract Disputes Act. We asked the parties to address this issue at oral argument (but had little success), and Mutual submitted a supplementary brief which has left us even more uncertain as to whether the district court had jurisdiction over the insurance companies' complaints. Without it, the court may not have had authority to enter an order enforcing the settlement agreement. In Kokkonen v. Guardian Life Insurance Co. of America, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), the Supreme Court held that a district court had no power to enforce a settlement agreement after it had completely dismissed the underlying suit. That case at least implies that district courts cannot enforce settlement agreements without some basis for jurisdiction of the underlying suit--which is merely a specific application of the long-standing rule that "[w]ithout jurisdiction the court cannot proceed at all in any cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868). See also Steel Co. v. Citizens for a Better Environment, --- U.S. ----, ----, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998) ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment--which comes to the same thing as an advisory opinion....")
 
 
 46
 In its supplemental brief, Mutual argued in a conclusory fashion that both of the insurance companies' complaints are really administrative challenges to the Office's interpretation of its own rules and the Health Benefits Act. But this characterization is not determinative, for "a plaintiff may not avoid the jurisdictional bar of the [Contract Disputes Act] merely by alleging violations of regulatory or statutory provisions rather than breach of contract." Ingersoll-Rand Co. v. United States, 780 F.2d 74, 77 (D.C.Cir.1985). Nor would the Health Benefits Act confer jurisdiction on the court if the complaints indeed turn on contract. A section of that Act does provide that "[t]he district courts of the United States have original jurisdiction, concurrent with the United States Court of Federal Claims, of a civil action or claim against the United States founded on this chapter." 5 U.S.C. § 8912 (1994) (emphasis added). But an action founded on contract is not "founded on this chapter." Cf. 28 U.S.C. § 1346(a)(2) (1994) (depriving district courts of jurisdiction over claims against the United States "founded upon any express or implied contract" with the United States that is subject to the Contract Disputes Act) (emphasis added). What matters is the source of the right at stake. As we said in Ingersoll-Rand, "determining whether an action is founded upon a contract ... 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).' " 780 F.2d at 76 (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C.Cir.1982)).
 
 
 47
 We think the best course, given our uncertainty as to the nature of the insurance companies' original claims, is to remand the case to the district court so that it can make an explicit determination as to its jurisdiction over the insurance companies' suits against the government. (It is of course possible that even if the district court lacked jurisdiction the settlement agreement would be enforceable [330 U.S.App.D.C. 268] in some tribunal.) But we think the Union is entitled to escape this mess. The district court expressly found that it was not a party to the settlement, and we cannot imagine how the Union could be otherwise "estopped" from pursuing its claim (nor, for that matter, how it could even be criticized for its behavior). We thus agree with the Union that the district court's order should be construed as reaching the merits of its claim against OPM--which it clearly lacked jurisdiction to do. Accordingly, we direct that the district court's order be vacated and the case remanded to determine whether the settlement can be enforced as to the parties other than the Union.
 
 
 48
 So ordered.
 
 
 
 [1]
 At the time this lawsuit was filed, this regulation was codified at 5 C.F.R. § 890.503(c)(6)
 
 
 [2]
 In its brief, the government disingenuously suggests that the Union did not object to the language in the settlement agreement until after October 12, 1995. To support this contention, the government compares an affidavit from the Union's counsel, which recounts the August 11 phone call, with one from Kozma making no reference to it. The government unforgivably omits reference to Kozma's second clarifying affidavit, in which he admits that this phone call did occur