# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 7, 2014　　　Decided May 8, 2015

No. 13-5039

TETON HISTORIC AVIATION FOUNDATION AND TETON AVJET
LLC, DOING BUSINESS AS TETON AVIATION CENTER,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF DEFENSE AND UNITED
STATES OF AMERICA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00669)

———

*Kevin R. Garden* argued the cause and filed the briefs for
appellants.

*Peter R. Maier*, Assistant U.S. Attorney, U.S. Attorney's
Office, argued the cause for appellees. On the brief were
*Ronald C. Machen Jr.*, U.S. Attorney, *R. Craig Lawrence*,
Assistant U.S. Attorney, and *Kevin Laden*, Special Assistant
U.S. Attorney. *Oliver W. McDaniel*, Assistant U.S. Attorney,
entered an appearance.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*,
and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: Teton Historic Aviation Foundation and Teton Avjet LLC (Teton) together operate as a nonprofit entity devoted to maintaining historic military aircraft. Teton is challenging various decisions of the Department of Defense that made it effectively impossible to buy surplus aircraft parts from the Department. The district court found that Teton lacks standing to sue because victory in court would not redress its injury. We disagree.

I

Congress has authority to "dispose of" all surplus government property. U.S. Const. art. IV, § 3. Congress has delegated this authority to the General Services Administration, 40 U.S.C. § 541, which has, in turn, delegated the authority to dispose of military equipment to the Department of Defense. The Department assigns a demilitarization code (Demil Code) to each type of its surplus military equipment that indicates its permissible disposition, including the conditions under which the equipment may be sold to the public.

At issue are aircraft parts assigned Demil Code A, B, Q, and D. Demil Code A includes equipment that is harmless and can be freely released by any means, including by sale to the public. At the beginning of the events giving rise to this dispute, the same was true for equipment designated as Demil Code B and Q.[1] Demil Code D indicates equipment that is too

---

[1] Demil Code B indicates equipment listed on the U.S. Munitions List of the International Traffic in Arms Regulations; these items have been modified or adapted in some fashion for a

dangerous to be released to the public; if the Department does not wish to reuse or store such equipment, it must be destroyed through shredding or other means.

The Department has a variety of ways to dispose of its surplus military equipment. It can, for example, make equipment available for humanitarian relief purposes; lend or sell it to state or federal law enforcement agencies, National Guard units, the Reserve Officer Training Corps, museums, foreign governments, or international organizations; or use it for "morale, welfare, and recreation activities and services." As it has done in this case, the Department can also release equipment for sale to the public. *See* 40 U.S.C. § 545.

Disposal of property through public sale is administered by an agency within the Department known at the time of the events at issue here as the Defense Reutilization and Marketing Service (DRMS).[2] DRMS has for some time organized these sales by releasing equipment to a private third-party contractor called Government Liquidation (GL) to be sold through public auctions. As relevant here, GL auctions off particular equipment with the understanding that winning bidders will have the right to obtain certain components from that equipment, subject to the Department's policies on the release of individual parts. A bidder who wins the auction knows that no matter how many parts are ultimately made available, it will still have to pay the entire sum of its winning bid or otherwise

military application. Demil Code Q indicates commercial and dual-use articles listed on the Commerce Control List of the Export Administration Regulations; Code Q equipment is commercially available and procured without modification. Codes A and D are not apparently assigned based on the origin of equipment in the way that Codes B and Q are assigned.

[2] DRMS has since been renamed the Defense Logistics Agency's Disposition Services.

cancel the sale. The winning bidder submits to GL a list of the individual parts or items it hopes to recover from the auctioned equipment. GL transmits each buyer's list to DRMS. On its receipt, the agency determines the Demil Code applicable to each type of part or item the buyer seeks and returns the list to GL, indicating which items from the auctioned equipment are actually available for sale. The winning bidder must still pay the full amount of its bid, no matter how few of the parts it sought turn out to be available. If the winning bidder is dissatisfied with the parts that it will obtain, the bidder can cancel the sale and receive a full refund.

In August 2008, Teton bid successfully in a GL auction to obtain the parts from five surplus A-4 military aircraft. Teton hoped to use the A-4 parts to perform maintenance and conversion work on historic aircraft it already owned. Teton put down a deposit of $50,000 to participate in the auction and won with a bid of $8,250. It sent a list to GL of the parts it hoped to obtain from these five aircraft, including 600 different part types for a total of approximately 5,000 discrete items. DRMS began to review Teton's list against the Demil Code database. Some number of these parts did not have a previously assigned Demil Code. Through an internal administrative process, these unclassified parts were classified as Demil Code D, which made them effectively unreleasable. Other parts Teton sought were already categorized as Demil Code A, B, or Q, meaning that they were available for sale.

Meanwhile, on November 14, 2008, the Department promulgated a new policy regarding the release of surplus property (the 2008 Policy). The 2008 Policy significantly decreased the types of equipment available for sale. Under the Policy, DRMS was required to categorize Demil Code Q equipment as either "sensitive" or "non-sensitive." While non-sensitive Q equipment could still be sold to the public as

before, sales of sensitive Q equipment were now prohibited. The 2008 Policy also prohibited the sale of all Demil Code B equipment.

The 2008 Policy substantially limited the number of aircraft parts Teton could purchase from the Department. Many of the parts Teton sought were now classified under the new policy as B or sensitive Q, meaning that they could no longer be sold to the public. GL eventually returned a final list to Teton on March 13, 2009, reflecting the parts that would actually be available if Teton decided to follow through with the sale. That final list contained 36 part types, totaling only 189 items.

At Teton's request, GL extended the deadline for response but warned that the sale would be cancelled unless Teton accepted the terms and made payment by this revised deadline. As the extended deadline arrived, Teton responded through counsel, communicating its concern that the final list reflected so significant a reduction in available parts that it represented a breach of contract. Teton asked for another week to continue reviewing the transaction, and GL granted this request. Shortly thereafter Teton's counsel advised GL that Teton intended to seek special legislation from Congress that would enable it to receive custody of an entire aircraft rather than purchasing individual parts. Teton requested that GL place their transaction on hold while Teton pursued this option, but GL refused and informed Teton that the sale would be cancelled unless Teton gave its assent by April 8, 2009. Teton's counsel responded that it would, if necessary, seek emergency relief in court to preserve the aircraft in question while pursuing a legislative solution. When Teton failed to accept the terms of the transaction by the April 8 deadline, the aircraft were destroyed on April 9 and on April 10 GL informed Teton that the transaction had been cancelled in accordance with the

Special Terms and Conditions of Sale under which the auction had been conducted.[3] However, noting that it "value[d] . . . future business" with Teton, GL refunded the sale price and deposit. Teton denied GL's authority to cancel the sale unilaterally and accepted the refund only by way of mitigating its damages.

That same day, Teton filed this action against the Department of Defense and DRMS, challenging the validity of the Department's policies regarding the sale of parts and its classification scheme. Teton did not name GL as a defendant. Teton immediately sought a temporary restraining order to prohibit the destruction of the aircraft, not yet knowing that the planes had already been destroyed.[4] Upon discovering that the aircraft had been destroyed, the Department located and set aside five comparable aircraft and entered into a consent TRO, later converted into a substantively identical consent preliminary injunction, guaranteeing the preservation of those aircraft while this case proceeded.

The parties briefed cross-motions for summary judgment on the merits of the dispute. The district court issued an order on December 21, 2012, setting oral argument and instructing the parties to be prepared to argue whether Teton had standing and, specifically, whether the relief Teton sought could redress the injury it claimed. After oral argument the district court dismissed the case for lack of standing, concluding that Teton had failed to show its alleged injury was redressable. *See Teton*

---

[3] Though the Special Terms themselves are not in the record, GL quoted the relevant provision in its correspondence with Teton on April 10, 2009. Teton has not argued either below or on appeal that GL misrepresented these conditions.

[4] Oddly one of the five aircraft had actually been destroyed months before, in September 2008, shortly after Teton won the auction for its parts. The record does not reflect why this occurred.

*Historic Aviation Found. v. United States*, 917 F. Supp. 2d 129 (D.D.C. 2013). The district court came to this conclusion for two reasons: first, Teton had not shown a substantial likelihood that the Department itself would choose to offer any parts for sale; second, even if the Department chose to release parts for sale, Teton had not shown that GL would likely sell the parts Teton wanted.

Teton filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291, and we "review the district court's decision on standing de novo." *Sierra Club v. Jewell*, 764 F.3d 1, 4 (D.C. Cir. 2014).

II

Article III of the Constitution limits the federal courts to the resolution of "cases" and "controversies," meaning that courts may only "redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). This limitation requires a plaintiff to show that it has standing to sue, meaning that it "has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (emphasis in original) (internal quotation marks omitted). The Supreme Court has explained that "the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must show injury in fact, or an "invasion of a legally protected interest which is (a) concrete and particularized; and (b) 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (internal quotation marks and citations omitted). Second, the plaintiff's injury must be "fairly traceable to the challenged action of the defendant."

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Third, and most importantly here, the plaintiff must demonstrate redressability, or "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 45 (1976)).

The Department does not dispute that Teton has satisfied the injury in fact and causation requirements. Nor could it reasonably do so. We have held that "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) (emphasis in original). Teton explains that it hopes to compete in future public auctions for aircraft parts of the same kind it originally sought here. If the Department's current rules endure, Teton will never have that chance: the vast majority of the parts it wants are either classified as Demil Code D and so could never have been released to the public, or are classified as Demil Code B or sensitive Q and so may no longer be released under the 2008 Policy. Nor is there any question that the Department caused Teton's injury. By classifying parts as it has, and by enacting the 2008 Policy, it has effectively barred the public sale of almost all the parts Teton seeks.

The dispute here is over redressability. The Department argues and the district court concluded that Teton's victory would do no more than make it possible for the Department to sell similar aircraft parts in the future. Mere possibility, the Department submits, falls short of the substantial likelihood

Article III requires.[5] Teton responds that the Department's past history of selling equipment of this kind suffices to shift the mere possibility of redress to the requisite substantial likelihood. Separately, the Department points out that, no matter what decision it made about its own property, the final decision to conduct a sale would be left to GL, who is not a defendant in this action. In the Department's view, because Teton's ultimate redress depends on the actions of a third party not before the court, Teton cannot show standing even if it could demonstrate a likelihood that the Department will comply with its wishes. Teton rejoins that GL is a mere instrument of the Department's decisions without an independent role and, separately, that GL's desire to earn revenue from holding sales would lead it to do so no matter what the Department said.

We agree with Teton on both issues. The Department has sold parts like these in the past and has incentives to do so in the future. And GL, evidently a mere pass-through for the Department's equipment sales, also has its own financial incentives that would likely lead it to sell whatever property the Department released. Thus Teton has standing to sue.

---

[5] It is not altogether clear what exactly Teton believes it would receive from success in this action. Teton may hope to change individual classifications assigned to specific part types, or it may plan to invalidate the 2008 Policy, or it may seek both outcomes. No matter; we conclude that, from the perspective of standing analysis, there is no difference between any of these possible forms of relief. Teton may seek an order reclassifying a large number of parts to Demil Code A, making them available for sale even if the 2008 Policy remains in place. Relief of this kind would constitute adequate redress for its injury. And vacating the 2008 Policy, irrespective of whether the underlying code assignments were left undisturbed, would have largely the same effect.

1

We think Teton has adequately shown that the Department would likely sell aircraft parts if Teton succeeded here. The Department has routinely sold its surplus property to the public in the past and has a continued, substantial interest in the income such sales can generate. For example, the record shows that the amount of revenue lost by restricting the sales of parts was among the considerations that were factored into the Department's adoption of the 2008 policy. There is no doubt that the Department is interested in its surplus equipment as a source of revenue and would have a clear incentive to resume such sales in the future if the 2008 Policy did not prevent it from doing so. Admittedly, the Department also has separate, important interests that can only be advanced by donating property to museums or transferring it to foreign governments. And there is no guarantee that the Department's interest in revenue from public sales will predominate at any point in the future, nor that the revenue from selling property of this particular kind will prove more attractive than alternative benefits. But these countervailing considerations do not make it irrelevant that the Department unmistakably has an interest in revenue from equipment sales. Fortunately for Teton, "a party seeking judicial relief need not show to a certainty that a favorable decision will redress [its] injury." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988). The Department's past practice of selling aircraft and the benefits it would receive from doing so are enough to establish a substantial likelihood that sales would take place should Teton prevail on the merits.

The Department argues that Teton can only speculate as to future sales because the Department would retain complete discretion over whether to sell equipment of this kind, even if Teton were to succeed on the merits here. It is true, as the

Department argues, that plaintiffs must show "more than the remote possibility . . . that their situation might . . . improve were the court to afford relief." *Warth*, 422 U.S. at 507. And as we have repeatedly held, a plaintiff does not have standing to sue when redress for its injury depends entirely on the occurrence of some other, future event made no more likely by its victory in court. *See, e.g.*, *Miami Bldg. & Constr. Trades Council, AFL/CIO v. Sec'y of Def.*, 493 F.3d 201, 206 (D.C. Cir. 2007) (finding no standing when redress depends on a future decision "beyond the court's control or ken"); *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) (finding no standing when redress depends on the future "'exercise of broad and legitimate discretion the courts cannot presume either to control or to predict'" (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989)). At the same time, a plaintiff need not "negate . . . speculative and hypothetical possibilities . . . in order to demonstrate the likely effectiveness of judicial relief." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 78 (1978). The Department might do almost anything with its own property whether Teton wins or loses. But in light of the Department's past decisions and the incentives that will shape its choices in the future, we think Teton has marshalled enough evidence to show a substantial likelihood of redress.

Separately, the Department insists that, whatever property it has sold in the past, it has never before sold A-4 aircraft. We take the Department at its word. But Teton's interest is not in acquiring intact A-4 aircraft, only in obtaining specific categories of parts from those aircraft. The record contains no evidence or testimony suggesting that the Department has never before sold the parts Teton seeks, as opposed to an entire A-4 aircraft. At an absolute minimum we know with certainty that the Department at least intended to sell the parts from the A-4 aircraft that were auctioned to Teton. Moreover, the

Department's own affidavits support Teton's position. The Department has told us that, although none of the A-4 aircraft currently in private hands in the United States were "purchased as usable airplanes from the Department of Defense by United States citizens or business entities," many of those aircraft "have been built from miscellaneous parts." These parts came from somewhere. It stands to reason that A-4 parts ended up in private hands because the Department sold them to the public.

Finally, the Department argues that no redressability exists here because Teton "lacks the legal right to compel" the Department to sell its property whether or not Teton wins its lawsuit. *Miami Bldg. & Const. Trades Council*, 493 F.3d at 206. True, in our past cases, a plaintiff who could not directly compel the defendant to redress its injury has often been able to establish redressability nonetheless because some independent legal requirement would force the defendant to offer whatever benefit was at issue. *See, e.g.*, *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 41-43 (D.C. Cir. 1999) (finding standing when the plaintiff sought to prove that FOIA required the defendant to produce certain information); *CC Distributors*, 883 F.2d at 151 (finding standing when the plaintiff alleged that the Department was legally required to offer the opportunity to compete for supply contracts); *W. Virginia Ass'n of Cmty. Health Crs., Inc. v. Heckler*, 734 F.2d 1570, 1572 & n.2, 1576 (D.C. Cir. 1984) (finding standing when the plaintiff claimed that the Primary Care Block Grant statute required the defendant to provide more money for funding community health centers). Here, no comparable rule or law would force the Department to do anything at all. Even so, Article III does not demand a demonstration that victory in court will without doubt cure the identified injury. The standing requirement would be a high wall indeed if a plaintiff could only sue when the defendant was under an inescapable obligation to act as the plaintiff desired. Our cases require more than speculation but less than

certainty. *Nat'l Wildlife Fed'n*, 839 F.2d at 705. And given the Department's past behavior and its future incentives, we believe Teton has met its burden.

2

We also side with Teton on the question of whether GL would likely choose to auction any property the Department released to it for public sale.[6] "When redress depends on the cooperation of a third party, 'it becomes the burden of the [plaintiff] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *US Ecology*, 231 F.3d at 24-25 (quoting *Defenders of Wildlife*, 504 U.S. at 562). Teton has done so; the record makes clear that GL is simply the Department's chosen instrument for disposing of its surplus property. For example, we know from amendments to the underlying contract between GL and the Department that GL agreed to be "the entity that processes DRMS assets." The Department also made clear in several internal documents that such property was being "sold through" GL as intermediary. And at oral argument the Department appeared to acknowledge as much:

> [COUNSEL FOR THE DEPARTMENT]: GL is the third party.
>
> [THE COURT]: All right. They're a pass-through. . . .

---

[6] Teton separately argues that it retains a valid contract with GL, that GL lacked authority to cancel that contract, and that Teton could simply compel GL to comply with that contract to cure Teton's injury. As we conclude that Teton has satisfied redressability even if no contract exists, we need not decide whether GL still has any contractual obligations to Teton.

> [COUNSEL FOR THE DEPARTMENT]: Indeed, but without that pass-through. . . .
>
> [THE COURT]: [H]ave you put in anything to suggest that if the [Department] were to release [property for sale to the public] that GL wouldn't make it available?
>
> [COUNSEL FOR THE DEPARTMENT]: No. . . .

Oral Arg. Tr. 24:15-25:7. The Department's acknowledgment conforms to what the record reflects: GL is a pass-through the Department employs to sell property to the public, not an independent operator that might do anything it wishes with Department property it acquires. We have previously found standing in cases where a third party would very likely alter its behavior based on our decision, even if not bound by it. *See, e.g.*, *Town of Barnstable v. F.A.A.*, 659 F.3d 28, 32 (D.C. Cir. 2011) (finding standing when the relevant third party would consider court-ordered action by the defendant "very, very seriously" in determining its own conduct); *Nat'l Parks Conservation Ass'n v. Mason*, 414 F.3d 1, 6 (D.C. Cir. 2005) (finding standing when the defendant clearly "expect[ed] and intend[ed] its decision to influence" the relevant third party). This is just such a case. Given GL's apparent subordination to the Department's sale decisions, GL would likely auction any property the Department released for sale.

Even if GL's commercial relationship with the Department were not as mechanical as we conclude the record shows it to be, GL's financial incentives provide an independent basis to find standing. When redress for a plaintiff's injury depends on a third party's independent action and the third party stands to profit by doing as the plaintiff hopes, we have found that the third party's "pecuniary interests" and the basic dynamic of "naked capitalism" are

enough to satisfy the redressability requirement. *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 135 (D.C. Cir. 2006). The Department does not actually dispute that GL likely will earn revenue from its business activity, but insists that the record lacks sufficient evidence for us to know without question whether or how GL makes money. We disagree. The record makes clear that GL generates revenue by auctioning property transferred to it from the Department. For example, internal Department communications relating to the adoption of the 2008 policy reflect concerns that a decrease in the number of items available for sale would decrease GL's revenues. From this we know that the Department understood that individual equipment sales had economic value to GL. And a Government Accountability Office report regarding the sale of military equipment to the public discusses financial incentives incorporated into the Department's contract with GL to ensure compliance with agency policy, showing that GL had multiple financial incentives to comply with the Department's wishes regarding the sale of its property. We are satisfied that GL does stand to receive revenue by selling to the public property it obtains from the Department. For that reason, even if GL actually retained discretion over what to do with such property, Teton would nonetheless satisfy the redressability requirement. We can trust in GL's economic self-interest to assume that it would likely sell any property the Department made available for sale.

The district court held otherwise. It found that GL must not have any pecuniary interest in selling the aircraft's parts because it did not try to resell the original aircraft after cancelling the sale to Teton. We disagree for two reasons. First, if so, GL presumably would never have bothered auctioning the parts of the original aircraft at all. That this sale ever took place suggests, as the record makes clear, that GL stands to

benefit from conducting auctions. Second, GL's decision not to resell the original aircraft was made inside the context of Department policies that left very few parts available for sale. Teton hopes to alter those policies so that it can obtain many or all of the parts it originally sought. If it succeeds in that quest, GL's prospect of successfully selling the parts of any similar aircraft will be significantly brighter and its incentives to bother conducting an auction correspondingly greater. Thus we remain convinced, no matter what GL did with the original aircraft after the sale to Teton fell apart, that GL will likely sell any property the Department chooses to make available in the future.

Finally, GL's correspondence with Teton offers yet another reason to think that GL would likely sell Department property in the future if given the opportunity. In its April 10 message cancelling the original sale, GL expressly informed Teton that it "value[d]" its "future business." We draw two inferences from this expression of GL's desire to deal with Teton again. First, GL's remark indicates that it likely would make sales to Teton in the future if in a position to do so. We have previously relied on such expressions from relevant third parties in concluding that redressability existed. *See, e.g.*, *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 10-11 (D.C. Cir. 2008) (where a plaintiff sought to vacate regulations that precluded a third party from conducting a program, finding redressability in part because of evidence that "strongly suggest[ed] a continuing intention on the part of [the third party] to resume the program once the regulatory obstacles are removed"). GL's own expression of its interest in future business with Teton makes us all the more confident that Teton would be able to compete for aircraft parts once the Department made them available for sale. Second, this remark suggests that GL cancelled the original transaction because the Department reduced the number of parts available

for sale to Teton, not because GL had any independent aversion to dealing with Teton. In other words, this is more evidence that GL ignores its own wishes and simply follows the Department's lead, whether the Department wishes it to sell property or not to sell property. *See, e.g.*, *Nat'l Parks Conservation Ass'n*, 414 F.3d at 7 (finding redressability where the legally compelled action of the defendant would "significantly affect" the behavior of the relevant third party).

For the foregoing reasons we conclude that Teton has shown redressability. In these specific circumstances Teton has adequately demonstrated, based on the Department's past willingness to sell property of this kind and its interest in the financial benefits from such sales, that the Department will likely sell aircraft parts in the future if Teton wins this suit. And though GL is an independent party, its relationship with the Department, its incentives, and its past expressions of intent together make clear that GL would likely sell any property the Department made available for sale.

## III

We reverse the order dismissing this action for lack of standing and remand this case to the district court.