# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued May 12, 2015　　　　Decided January 29, 2016

No. 14-1149

IN RE: IDAHO CONSERVATION LEAGUE, ET AL.,
PETITIONERS

---

On Petition For Writ of Mandamus to the
United States Environmental Protection Agency

---

*Amanda W. Goodin* argued the cause for petitioners. With her on the petition for writ of mandamus, the reply thereto, and the supplemental brief was *Jan Hasselman.*

*John E. Sullivan*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the opposition to the petition of writ of mandamus and supplemental submission was *John C. Cruden*, Assistant Attorney General.

*Michael S. Giannotto* argued the cause for movant-intervenor National Mining Association. With him on the opposition to the petition for writ of mandamus and supplemental brief were *Matthew M. Hoffman* and *Brian T. Burgess.*

*Kevin A. Gaynor*, *John P. Elwood*, *Jeremy C. Marwell*, and *Joshua S. Johnson* were on the opposition to the petition for writ of mandamus and the responsive supplemental brief of movant-intervenor Freeport-McMoRan Inc.

2

*Michael W. Steinberg*, *Leslie A. Hulse*, *Stacy R. Linden*, and *Matthew A. Haynie* were on the opposition to the petition for writ of mandamus and the responsive brief for movant-intervenors Superfund Settlements Project, et al.

Before: HENDERSON, ROGERS and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Presently before the court is a joint motion by environmental petitioners and the Environmental Protection Agency for an order on consent. This matter began with a petition filed by six environmental organizations for issuance of a writ of mandamus directing EPA to promulgate the financial assurance regulations required by section 108(b) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675. Section 108(b) provides that EPA "shall promulgate" regulations requiring "that classes of facilities establish and maintain evidence of financial responsibility consistent with the degree and duration of risk associated with the production, transportation, treatment, storage, or disposal of hazardous substances." *Id.* § 9608(b)(1). Thirty years later, EPA has yet to issue any regulations. Petitioners sought a declaration that EPA had unreasonably delayed in failing to issue any regulations under section 108(b) and an order directing EPA to issue financial assurance regulations by January 1, 2016 for the four industries EPA had previously identified as most needing them. Pet. 1.

Petitioners and EPA have now filed a joint motion for an order on consent establishing an agreed upon schedule for a rulemaking for the hardrock mining industry and timetable by which EPA would consider whether other industries would be involved with a financial assurance rulemaking. Joint Mot. 3–4.

We grant the joint motion. At least one of the petitioners has standing under Article III of the Constitution, and because the joint motion resolves the issues presented by the petition for mandamus, the court has no occasion to decide whether EPA's delay in promulgating section 108(b) regulations was unreasonable delay for which mandamus would lie.

**I.**

Congress enacted CERCLA "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks and citation omitted). CERCLA vests in EPA "'broad power to command government agencies and private parties to clean up hazardous waste sites' by or at the expense of the parties responsible for the contamination." *Gen. Elec. Co. v. Envtl. Prot. Agency*, 360 F.3d 188, 189 (D.C. Cir. 2004) (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994)). CERCLA also authorizes EPA to undertake "response actions" — using funds from the Hazardous Substance Superfund — when there is a release or substantial threat of release of a hazardous substance, pollutant, or contaminant. *Id.* (citing 42 U.S.C. § 9604); *see also* 42 U.S.C. § 9611; 26 U.S.C. § 9507; *El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 874–75 (D.C. Cir. 2014); *Superfund Implementation*, Exec. Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987). EPA may either replenish the expended funds through a cost recovery action against the parties responsible for the release, 42 U.S.C. § 9607(a), or seek to require the responsible parties themselves to undertake response actions through an administrative or court order. *Id.* § 9606(a).

At issue are "financial assurance" or "financial responsibility" regulations, whereby those entities potentially responsible for the release of hazardous substances can put aside funding — or otherwise demonstrate that funding is available — to pay for any necessary cleanup or reclamation efforts. Section 108(b) of CERCLA provides that "[b]eginning not earlier than five years after December 11, 1980, [EPA] shall promulgate requirements . . . that classes of facilities establish and maintain evidence of financial responsibility consistent with the degree and duration of risk associated with the production, transportation, treatment, storage, or disposal of hazardous substances." *Id.* § 9608(b)(1). In the intervening thirty years since section 108(b) took effect, EPA has made little progress toward promulgating any financial assurance regulations. Not until certain petitioners here sued in California did EPA identify which classes of facilities required financial assurance rules. *Sierra Club v. Johnson*, No. C 08-01409 WHA, 2009 WL 482248, *7–10 (N.D. Cal. Feb. 25, 2009). EPA published a priority notice that it would first develop CERCLA financial assurance rules for the hardrock mining industry. *See Identification of Priority Classes of Facilities for Development of CERCLA Section 108(b) Financial Responsibility Requirements*, 74 Fed. Reg. 37,213, 37,214 (July 28, 2009). In January 2010, EPA also issued an advanced notice of proposed rulemaking of its plan to develop "as necessary" financial assurance requirements for three additional industries: chemical manufacturing; petroleum and coal products manufacturing; and electric power generation, transmission, and distribution. *Identification of Additional Classes of Facilities for Development of Financial Responsibility Requirements Under CERCLA Section 108(b)*, 75 Fed. Reg. 816, 816 (Jan. 6, 2010). EPA has repeatedly postponed the completion date for the hardrock mining regulations, and it has not indicated if a rulemaking will occur for the three other industries, or, since 2011, even mentioned the rulemakings in its regulatory agenda.

On August 11, 2014, six environmental organizations petitioned this court for a writ of mandamus "directing EPA to finalize [CERCLA financial assurance] rules by January 1, 2016, for the four industries already identified by EPA." Pet. 1. Petitioners argued the passage of nearly thirty years since EPA was first charged by Congress with issuing such regulations amounts to an unreasonable delay warranting mandamus relief. *Id.*

At oral argument on May 12, 2015, petitioners acknowledged that the January 2016 deadline was no longer feasible due to the passage of time, *see* Oral Arg. Recording at 15:58–16:20, and EPA claimed that it had recently completed a "framework" for a hardrock mining proposed rule, *id.* at 20:49–24:46. The court thereafter ordered the petitioners and EPA to confer on (1) the date by which EPA would propose and finalize financial assurance rules for the hardrock mining industry and (2) the date by which EPA would decide whether to propose rules for the three other industries EPA identified as possibly requiring financial assurance rules. Order (May 19, 2015) (Judge Millett did not join as to (2)). EPA also was to file the "framework" with the court.

Subsequently, the parties filed a joint motion for an order on consent establishing an agreed upon schedule for a rulemaking for the hardrock mining industry and a timetable by which EPA would determine whether to engage in financial assurance rulemaking for any of the three other industries. Joint Mot. 3–4. In particular, the parties agreed that EPA would begin the rulemaking process for the hardrock mining industry by December 1, 2016 and publish its notice of final action by December 1, 2017. The parties also agreed that EPA would decide by December 1, 2016 whether it would proceed with a rulemaking for any of the other three industries. If EPA decides to go forward with one or more rulemakings, then it must

complete final action for the first industry by December 2, 2020, the second industry by December 1, 2021, and the third industry by December 4, 2024. The parties may jointly stipulate to a change in the schedule, Joint Mot. 6–7, and if petitioners oppose an extension, EPA may file a motion seeking court approval, *id*. 5. EPA would submit compliance status reports to the court every six months. *Id.* 7. The joint motion states that the parties' agreement resolves the issues presented by the petition for mandamus. *Id.* 1. The joint motion further sought to have this panel retain jurisdiction until the schedule had been completed. *Id.* 6–7. EPA also filed its "framework" with the court.

## II.

As a threshold matter, the court must determine whether it has jurisdiction to consider the order proposed in the joint motion, and that requires determining whether petitioners have Article III standing to seek a court order on consent. *See CTS Corp. v. Envtl. Prot. Agency*, 759 F.3d 52, 57 (D.C. Cir. 2014); *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1018–19 (D.C. Cir. 1998); *Swift & Co. v. United States*, 276 U.S. 311, 324, 326 (1928); *cf. Mut. of Omaha Ins. Co. v. Nat'l Ass'n of Gov't Emps., Inc.*, 145 F.3d 389, 394 (D.C. Cir. 1998). Because the proposed order would grant procedural relief — a rulemaking — with respect to the hardrock mining industry, petitioners need show that at least one petitioner has standing to challenge the lack of financial assurance regulations in the hardrock mining industry. Whether EPA must engage in the other proceedings initially sought by petitioners through mandamus remains within EPA's discretion under the schedule set forth in the proposed consent order. To the extent petitioners would obtain relief through the setting of a schedule, however, we have assumed they must show standing for that relief as well.

An organization has standing to bring suit on behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The court has no reason to doubt that the petitioners satisfy the second and third requirements for associational standing. "The issue before the court, then, is whether at least one [of the petitioner's] member[s] . . . has standing under Article III." *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898 (D.C. Cir. 2002). The "irreducible constitutional minimum" of Article III standing requires satisfaction of three elements: (1) a concrete and particularized and actual or imminent injury-in-fact that is (2) fairly traceable to the challenged action of the defendant (and not the result of the independent action of some third party not before the court) and (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The petitioners' burden of production is to support each of these elements "by affidavit or other evidence," and their burden of proof is not to demonstrate certainty but to "show a '*substantial probability*'" that each of these elements has been met. *Sierra Club*, 292 F.3d at 899 (emphasis added).

**A.**

At least one petitioner has met Article III's requirements with respect to hardrock mining. Through the declaration of John Robison, the Idaho Conservation League has shown that at least one of its members has suffered and continues to be threatened with ongoing and certainly impending injuries-in-fact that are caused by EPA's failure to promulgate financial assurance regulations in the hardrock mining industry and that will be redressed by promulgation of such rules. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143, 1148 (2013); *Defs. of*

*Wildlife*, 504 U.S. at 560–61. So long as one petitioner has standing, that suffices for the court to evaluate the merits of the order on consent: "[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case," *Ry. Labor Execs. Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993) (citing *Doe v. Bolton*, 410 U.S. 179, 189 (1973)).

*Injury-in-fact*. Robison lives, works, and recreates near hardrock mining facilities, and he is in harm's way and will continue to be in harm's way in the future. Petitioners focus on two sources of injury caused by hardrock mining sites: (1) hazardous releases from various currently operating or proposed hardrock mining facilities that harm their economic, health, aesthetic, and recreational interests and imminently threaten to do so into the future; (2) the substantial probability that they will continue to be harmed even after operations cease because cleanup of such sites can take a long time. As a result of unnecessarily prolonged cleanup and reclamation efforts, the threat of future harm to Robison is real.

Robison has described in "substantial detail the injuries [he] fear[s] from ongoing and future mining operations." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 707 (D.C. Cir. 1988). Although Robison describes many examples where his recreational interests were harmed by arsenic-laden mine tailings and waste, he further explains that two mining projects in particular — the proposed Midas Gold project and the older Atlanta Gold mine — threaten his future enjoyment of the Idaho wilderness. Although the former project is still in the planning stage, the record establishes that the mine is likely to go forward even though it is not yet complete; the mining company has concrete plans to proceed, the mine would be profitable, and the mine continues to solicit financing to make the mine a reality. The mine may not be completed for some time, but Robison has

presented concrete evidence substantiating a significant risk he will be harmed by the proposed mine. *See Clapper*, 133 S. Ct. at 1153–54; *Defs. of Wildlife*, 504 U.S. at 572 n.7. By contrast, the Atlanta Gold mine is currently operating and is known to discharge hazardous substances into the Boise River system, a source of water Robison frequents. Although the mine operator currently treats the discharge, Robison reasonably fears that such treatment will stop because the mine operator has a low net worth and there are currently insufficient financial assurances for future cleanup efforts.

*Causation and redressability*. The record also establishes that both sets of harms are caused by the lack of financial assurance rules and would be redressed by EPA promulgating such rules. Where, as here, causation and redressability "hinge on the response of the regulated (or regulable) third party to the government action or inaction," *Defs. of Wildlife*, 504 U.S. at 562, "the petitioner bears the burden of 'adduc[ing] facts showing that those [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury," *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (alterations in original) (citation omitted). "Article III does not demand a demonstration that victory in court will without doubt cure the identified injury. . . . Our cases require more than speculation but less than certainty." *Teton Historic Aviation Found. v. U.S. Dep't of Defense*, 785 F.3d 719, 727 (D.C. Cir. 2015) (citation omitted).

With respect to mitigating ongoing hazardous releases, the lack of financial assurance requirements causes mine operators to release more hazardous substances than they might if such financial assurance requirements were in place. Although CERCLA requires operators to pay to clean up hazardous releases, *see* 42 U.S.C. § 9607(a), many avoid payment by

structuring their operations so they never have to pay. It is a common practice for operators to avoid paying environmental liabilities by declaring bankruptcy or otherwise sheltering assets. *See Identification of Priority Classes of Facilities for Development of CERCLA Section 108(b) Financial Responsibility Requirements*, 74 Fed. Reg. at 37,217; U.S. GOV'T ACCOUNTABILITY OFF., GAO-05-658, ENVIRONMENTAL LIABILITIES: EPA SHOULD DO MORE TO ENSURE THAT LIABLE PARTIES MEET THEIR CLEANUP OBLIGATIONS 1–2, 33, 58–59 (2005). At the very least, this limits the incentive to adopt best practices, and in some circumstances may encourage operators to take on greater risks knowing they will never have to pay the costs. In view of these common practices, financial assurances would strengthen hardrock mining operators' incentives to minimize ongoing hazardous releases. By making it more difficult for mine operators to avoid paying for the cleanup of their hazardous releases, basic economic self-interest means the operator will take cost-effective steps to minimize hazardous releases in order to minimize their environmental liabilities.

The court has long relied on such economic and other incentives to find standing. *See Teton Historic Aviation Found.*, 785 F.3d at 725–26; *Airlines for Am. v. Transp. Sec. Admin.*, 780 F.3d 409, 410–11 (D.C. Cir. 2015); *Natural Res. Def. Council v. Envtl. Prot. Agency*, 643 F.3d 311, 318 (D.C. Cir. 2011); *Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 135–36 (D.C. Cir. 2006); *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989). And the notion that financial assurance requirements deter environmental misconduct is hardly novel. As the Fourth Circuit Court of Appeals recognized in evaluating a similar financial assurance program, "[t]he incentive for safety is obvious: the availability and cost of a bond will be tied directly to the structural integrity of a facility and the soundness of its day-to-day operations." *Safety-Kleen, Inc. (Pinewood) v.*

*Wyche*, 274 F.3d 846, 866 (4th Cir. 2001). "[S]loppy 'design and operating procedures . . . are more likely to be avoided' with the financial assurance requirements and the resulting incentive to reduce bond costs." *Id.* (alterations in original) (quoting *Standards Applicable to Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities; Financial Requirements*, 47 Fed. Reg. 15,032, 15,044–45 (Apr. 7, 1982)).

This incentives-based theory of standing is further supported by congressional and agency assessments. Such assessments may be considered: "[W]hile Congress cannot create standing on its own, it can provide legislative assessments which courts can credit in making standing determinations." *Nat'l Wildlife Fed'n*, 839 F.2d at 708; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). As the Senate Committee Report observed in connection with the Superfund Improvement Act of 1985, "a major goal of [CERLCA's] financial responsibility requirements is to enlist insurers to provide additional policing and incentives to monitor the behavior of their insureds . . . . It is often policy terms and conditions, as well as inspection and rate-making, that form the basis of the insurer's ability to influence the insured to act carefully and responsibly." S. REP. 99-11, at 47 (1985). EPA, too, has concluded that financial assurances play a critical preventative role by creating incentives for the proper handling of hazardous substances. *See, e.g.*, ENVTL. PROT. AGENCY REGION 10 MINING TEAM, REGION 10 MINING FINANCIAL ASSURANCE STRATEGY 2 (2008); ENVTL. PROT. AGENCY, COMPLIANCE AND ENFORCEMENT NATIONAL PRIORITY: FINANCIAL RESPONSIBILITY UNDER ENVIRONMENTAL LAW 1 (2005).

Because hardrock mining is already subject to some financial assurance requirements, the impact of new financial assurance requirements may be reduced. *Cf.* Decl. of Barnes

Johnson, Dir. of Office of Res. Conservation and Recovery, Envtl. Prot. Agency ¶¶ 30–31 (Nov. 19, 2014) (citing Reducing Excessive Deadline Obligations Act of 2013, H.R. 2279, 113th Cong. § 104 (as passed by House, Jan. 9, 2014), and 160 CONG. REC. H475, H979 (daily ed. Jan. 15, 2014)). But "the existence of alternative 'protective conditions' does not negate a party's standing to enforce statutorily mandated regulations." *Sierra Club v. Envtl. Prot. Agency*, 129 F.3d 137, 139 (D.C. Cir. 1997). So long as existing regulatory coverage — or the lack thereof — subjects at least one petitioner to some harm, that is sufficient to confer standing to challenge the regulatory regime (or lack thereof). *See id.*; *Airlines for Am.*, 780 F.3d at 411. The record shows that the Idaho Conservation League's member faces such harms because there are gaps in the existing regulatory landscape; financial assurance procedures are inconsistent and inadequate. Although EPA sometimes negotiates case-by-case financial assurance requirements after significant releases of hazardous substances have occurred, those tools are limited and do not cover many facilities that pose the risk of such releases. Further, the record shows that some facilities file for bankruptcy protection without entering into a settlement agreement, which may make it difficult for EPA to recover any of the cleanup costs. There is no evidence that the facilities identified by Robison are immune to these problems; he demonstrates that the facilities about which he is concerned are not adequately covered by existing financial assurance requirements. Because additional financial assurance requirements would address gaps in protection that affect Robison's interests and there are no "reasons beyond the challenged government action for the third parties to continue the conduct that caused injury to the [petitioners]," *see Ams. for Safe Access v. Drug Enforcement Admin.*, 706 F.3d 438, 448 (D.C. Cir. 2013), there is no basis to doubt that the congressional assessment and economic logic further support causation and redressability. Nor is the connection between imposing financial assurance requirements

and mine operators choosing to reduce their releases into the environment too attenuated to require more to support standing. *See, e.g.*, *Ctr. for Biological Diversity*, 563 F.3d at 478.

Furthermore, under petitioners' second theory of standing, EPA's failure to promulgate CERCLA financial assurance regulations contributes to funding shortfalls for cleanup efforts, which delays remediation and increases the length of time Robison would be exposed to hazardous substances. As discussed, the lack of financial assurance requirements means that mine operators can avoid paying some portion of the cleanup costs by declaring bankruptcy. Although the federal government has taken over responsibility for cleaning up these sites, the record shows that cleanup proceeds at a slower rate than it would if fully funded. Slower cleanups prolong the public's exposure to hazardous materials. With respect to hardrock mining, EPA concluded that "if the total Federal, State, and potentially responsible party outlays for remediation were to continue at existing levels . . . , no more than eight to 20 percent of all cleanup work could be completed within 30 years." *Identification of Priority Classes of Facilities for Development of CERCLA Section 108(b) Financial Responsibility Requirements*, 74 Fed. Reg. at 37,217. For instance, "EPA officials [have reported] that at the Bunker Hill Mining site in Idaho . . . the pace of the cleanup had to be slowed down because of preconstruction and remedial action funding limitations." U.S. GOV'T ACCOUNTABILITY OFF., GAO-10-380, SUPERFUND: EPA'S ESTIMATED COSTS TO REMEDIATE EXISTING SITES EXCEED CURRENT FUNDING LEVELS, AND MORE SITES ARE EXPECTED TO BE ADDED TO THE NATIONAL PRIORITIES LIST 18 (2010). In view of these assessments, there is a substantial risk that cleanup delays will occur in hazardous-waste-releasing sites near Robison. The injuries threatened by such delayed cleanup would be redressed by an order requiring EPA to finalize a hardrock-mining financial assurance rule.

Whether financial assurance requirements provide the funds to clean up a site directly, or free up government funds to clean up the site, the record makes clear that financial assurances would reduce current delays in cleanup at these sites.

Assuming, as we must for purposes of standing, that EPA adheres to the schedule set forth in the joint order on consent and timely promulgates financial assurance requirements in the hardrock mining industry, *see, e.g.*, *Sierra Club v. Envtl. Prot. Agency*, 699 F.3d 530, 533 (D.C. Cir. 2012), there is a substantial probability that doing so will reduce the injuries caused to one member of the Idaho Conservation League. Promulgating a financial assurance rule in the hardrock mining industry will lessen, if not prevent, both ongoing hazardous waste release and future delays in cleaning up such releases, which, in turn, will limit Robison's exposure to these hazards. Accordingly, we hold that at least one petitioner has established standing under Article III.

**B.**

To the extent that a showing of standing is also needed for the requirement that EPA decide whether to conduct a rulemaking in any of the other three industries by a specific date as a different form of relief, *cf. Laidlaw*, 528 U.S. at 186, the declarations of members of Sierra Club and the Idaho Conservation League show that they are currently harmed and will continue to be harmed by the lack of financial assurance regulations for the remaining industries. For instance, Karla Land, a member of the Sierra Club, lives and works near petroleum and chemical manufacturing facilities that dump hazardous substances in the San Juacinto River and will continue to do so in the future. This harms her interests because it limits her ability to test the jet skis she repairs and to fish in the river. Similarly, Justin Hayes, a member of the Idaho Conservation League, explains how he is harmed by the lack of

financial assurance regulations. Specifically, he is concerned about the Monsanto Chemical Company Superfund site, which is located at a Monsanto facility that processes chemicals and continues to contaminate the groundwater near springs he likes to visit and from which he drinks the spring water. Although Monsanto has undertaken some cleanup at the site, he has reason to fear that the additional contamination will require even more cleanup and that there is nothing to stop Monsanto from ceasing to clean up the area. Mark Romines of the Sierra Club states that a nearby power generating facility is releasing coal ash directly into the Ohio River and has made no effort to clean up these hazardous releases, so that he is no longer able to swim in the river. He is especially concerned that he is currently vulnerable to the possibility that a coal ash retention pond down the street could breach, releasing black coal water into the subdivision where he lives. Finally, Richard Kark, a member of the Sierra Club, states that the active electric power plant near his home is contaminating the French Broad River in which he canoes, and that the coal ash dam created by the plant could burst, harming his community.

In sum, these declarations show that at least one of petitioners' members have been and continue to be harmed by facilities in the three remaining industries and that, just as with hardrock mining, *supra* Part II.A., financial assurance requirements would redress their injuries by incentivizing these industries to limit hazardous releases and by reducing cleanup delays. Additionally, a schedule for decision-making affords petitioners relief as it is more likely that EPA will promulgate financial assurance regulations and make that decision sooner rather than later. Petitioners need not show that "but for the alleged procedural deficiency the agency would have reached a different substantive result." *See, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013); *Sugar Cane Growers Co-op. of Fla. v. Veneman* 289 F.3d 89, 94–95 (D.C.

Cir. 2002). Even though petitioners could not establish "with any certainty" that requiring EPA to decide whether to conduct a rulemaking will result in financial assurance regulations for the remaining industries, it is enough that this "procedural step [is] connected to the substantive result" sought by petitioners — promulgation of financial assurance rules for the remaining industries. *See Sugar Cane*, 289 F.3d at 94–95 (citation and internal quotation marks omitted); *WildEarth*, 738 F.3d at 306.

Therefore, the court is assured that at least one petitioner has standing to obtain all of the relief sought in the order in the joint motion on consent.

## **III**.

Also pending are motions to intervene as of right under CERCLA, 42 U.S.C. § 9613(i) and Federal Rule of Civil Procedure 24(a), filed by Freeport-McMoRan, Inc. ("Freeport"), the National Mining Association, and a group of other industry intervenors including the Superfund Settlements Project, the American Chemistry Council, and the American Petroleum Institute (herein, the "Superfund group"). The motions were filed after the court ordered EPA to respond to the petition for a writ of mandamus seeking rules by set dates, and they have not been supplemented since the joint motion on consent was filed. Our decision in *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323–25 (D.C. Cir. 2013), is controlling. *See also Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*, 786 F.3d 1050, 1053 (D.C. Cir. 2015); *In re Endangered Species Act Section 4 Deadline Litig.*, 704 F.3d 972, 976 (D.C. Cir. 2013). We conclude the proposed intervenors fall short of demonstrating their right to intervene because they fail to show they have Article III standing, which they do not dispute is

required.[1] We further conclude permissive intervention would be inappropriate. *See* FED. R. CIV. P. 24(b)(1)(B).

Because the petition for mandamus is no longer at issue, those seeking to intervene must base their Article III standing on harms caused by the joint motion on consent, not the relief sought in the petition for mandamus or concerns generated by EPA's "throat-clearing" beyond the joint order on consent. *Perciasepe*, 714 F.3d at 1325 n.7. They suggest generally that stricter hardrock mining regulation is a foregone conclusion. But the proposed joint order "does not *require* EPA to promulgate a new, stricter rule." *Id*. at 1324. At most, it "merely requires that EPA conduct a rulemaking and then decide whether to promulgate a new rule — the content of which is not in any way dictated by the [proposed order on consent] — using a specific timeline." *Id.* The timeline in the joint motion requires that EPA commence a rulemaking with respect to hardrock mining by December 1, 2016, and provide "notice of its final action" by December 1, 2017. Joint Mot. 3. Although more is required with respect to hardrock mining than the other identified industries, where EPA retains discretion not to conduct a rulemaking at all, EPA retains "discretion to promulgate a rule or decline to do so" even for the hardrock mining industry. *See Perciasepe*, 714 F.3d at 1325 n.7; *see also* 5 U.S.C. § 551(13). The joint motion on consent states that "[n]othing in this Joint Motion should be construed to limit or modify the discretion accorded EPA by CERCLA or the general principles of administrative law." Joint Mot. 6. It neither resolves the substance of any rulemaking nor even which

---

[1] With respect to Part III of this opinion, Judge Millett joins only the last paragraph denying permissive intervention. She would hold that hardrock mining intervenors have standing but deny intervention in view of their unhindered ability to participate in that rulemaking.

classes of hardrock mining facilities will be regulated. *See* 2nd Decl. of Barnes Johnson, Dir. of Office of Res. Conservation and Recovery, Envtl. Prot. Agency, Ex. 1, at 1 (Aug. 25, 2015) ("framework" for hardrock mining rules). In other words, nothing about this particular order on consent makes it any more likely than in *Perciasepe*, 714 F.3d at 1324–25, that proposed intervenors will be subject to regulation, much less suffer concrete harm to their interests, *cf. Fund for Animals v. Norton*, 322 F.3d 728, 733–34 (D.C. Cir. 2003). Because the order sought in the joint motion on consent merely "prescribes a date by which regulation could occur," proposed intervenors have not established Article III standing. *See Perciasepe*, 714 F.3d at 1325.

That the schedule for EPA to act has been condensed over what was originally proposed by EPA in responding to the petition for mandamus does no more to establish proposed intervenors' standing. Freeport explains in very general terms why the proposed schedule in the joint motion is unreasonable, but it does not explain how the schedule might harm it, *see* Freeport Suppl. Resp. 1–5, much less attempt to establish how that schedule increases its information gathering costs. *See Perciasepe*, 714 F.3d at 1326. Nor do the proposed intervenors point to authority that the proposed one-year period for notice-and-comment is so short that it would necessarily harm them. *See id.* at 1324; *Omnipoint Corp. v. Fed. Commc'n Comm'n*, 78 F.3d 620, 630 (D.C. Cir. 1996).

Alternatively, had the proposed intervenors argued that Article III standing is not required for intervention as of right under CERCLA § 9613(i), which they did not, our conclusion would be the same. Their concerns about the order sought by the joint motion on consent, which sets only a schedule for rulemaking, are insufficient to show the necessary impairment to their interests. *See Alt. Research & Dev. Found. v. Veneman*,

262 F.3d 406, 411 (D.C. Cir. 2001). Granting the joint motion on consent would not prevent proposed intervenors from seeking to intervene in the scheduled rulemaking or challenging a final rule that subjects them to regulation. *See id.*

As to permissive intervention, it is discretionary. *See Equal Emp't Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). Given proposed intervenors' failure to show in regard to the order on consent a "claim or defense that shares with the main action a common question of law or fact," FED. R. CIV. P. 24(b), such intervention would be inappropriate.

**IV.**

Finally, we conclude that the motion and its proposed order appropriately respond to the court's order of May 19, 2015. That suffices for the court to grant the joint motion. Even an intervenor would lack the power to block the order on consent by withholding their consent, *see Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 528–29 (1986). Besides that, our role in evaluating the reasonableness of a proposed consent order is limited. *See Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1125–26 (D.C. Cir. 1983). As a district court has "power to enter a consent decree without first determining that a statutory violation has occurred," *id.* (citing *Swift*, 276 U.S. at 327), its duty is only to "satisfy itself of the settlement's 'overall fairness to beneficiaries and consistency with the public interest.'" *Id.* (quoting *United States v. Trucking Emps., Inc.*, 561 F.2d 313, 317 (D.C. Cir. 1977)). Thus, this court has instructed:

> The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or

controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties.

*Id.* (quoting *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)). We view our role to be similarly limited inasmuch as the joint motion resolves a petition for mandamus that originated in this court and conclude that the joint motion satisfies this standard.

Stated broadly, Congress, in enacting CERCLA, has determined that the financial assurance provisions required by section 108(b) are in the public interest. In adopting amendments to CERCLA, Congress has retained these provisions. The joint motion on consent is designed to ensure meaningful implementation of them. For the same reason, petitioners have concluded that the joint motion represents a fruitful way to achieve their objectives. Nothing on the face of the joint motion suggests unfairness to any interested parties. As noted, Part III *supra*, the joint motion does not preordain the content of a rulemaking much less indicate that in committing itself to conducting a rulemaking EPA has prejudged the outcome for the hardrock mining industry. Once EPA publishes a notice of proposed rulemaking, interested parties will have an opportunity to present their comments, and if EPA publishes a final rule, those affected could challenge it.

Considering the arguments presented by those seeking to intervene as arguments of *amici*, *see* 7A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1913 (3d ed. 2015), does not persuade us to deny the joint motion. For instance, in urging that the joint motion on consent is not a reasonable settlement of the parties' positions, *amici* focus on the compressed schedule for EPA to act. EPA

had stated in response to the petition for mandamus that petitioners' proposed schedule — requiring a final rule for all four industries by January 2016 — was unreasonable in view of the many tasks to be completed before proposing a financial assurance rule as well as difficulties that might arise after the comment period. *See, e.g.*, Decl. of Barnes Johnson ¶¶ 33-35, 71-73. Instead, EPA suggested that it could not produce a final rule for the hardrock mining industry until August 2019. *See id.* ¶ 73. Now EPA has represented that it can produce a final rule by December 2017. There is no reason to doubt its representation to the court inasmuch as EPA has a "framework" to facilitate rulemakings and the joint motion on consent affords EPA additional time to act in several key areas while preserving its discretion in other areas. Under the joint motion, the deadline for proposing a hardrock mining rule has been extended from August 2016 to December 1, 2016, even though the period for notice and comment has been reduced from three years, as EPA originally estimated, to one year. Further, EPA no longer faces the imminent possibility that the court would grant mandamus for financial assurance rules in the other three industries, Pet. 1, as it retains discretion to determine whether to engage in a rulemaking for these industries at all. If EPA decides to proceed with rulemaking for other industries, it has until 2024 to provide notice of its final action for the third industry. Contrary to *amici*'s suggestion, schedule adjustments like these are not substantive reversals in policy that require explanation beyond what is evident on the face of the parties' joint motion on consent. *See Perciasepe*, 714 F.3d at 1324 & n.6; *Omnipoint Corp.*, 78 F.3d at 629–30; *cf. Envtl. Def. Fund, Inc. v. Costle*, 636 F.2d 1229, 1255–56 & n.93 (D.C. Cir. 1980); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* 463 U.S. 29, 41–42 (1983). EPA's representation, moreover, is properly understood in the context of acknowledging that Congress's instruction on financial assurance rules was issued more than thirty years ago.

Accordingly, because the parties' joint motion on consent appropriately responds to the Court's order and is reasonable, we grant the motion. An order accompanies this opinion.