# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 13, 2019          Decided July 19, 2019

No. 18-1141

IDAHO CONSERVATION LEAGUE, ET AL.,
PETITIONERS

v.

ANDREW WHEELER, ADMINISTRATOR,
U.S. ENVIRONMENTAL PROTECTION AGENCY AND
ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

ALBEMARLE CORPORATION, ET AL.,
INTERVENORS

———

On Petition for Review of Final Action by
the United States Environmental Protection Agency

———

*Amanda W. Goodin* argued the cause for the petitioners. *Jan E. Hasselman* and *Jaimini Parekh* were with her on brief. Patti A. Goldman entered an appearance.

*Jeffrey Bossert Clark*, Assistant Attorney General, United States Department of Justice, argued the cause for the respondents. *Jonathan Brightbill*, Deputy Assistant Attorney General, and *John E. Sullivan*, Attorney, were with him on brief.

*Brian T. Burgess* argued the cause for the Industry Intervenors. *Michael S. Giannotto*, *Andrew Kim*, *Kevin P. Martin*, *Keith Bradley*, *Carolyn L. McIntosh*, *Kevin A. Gaynor*, *Jeremy C. Marwell*, *Joshua S. Johnson*, *George A. Tsiolis*, *Chris S. Leason*, *Andrew E. Dudley*, *Thomas A. Lorenzen* and *Preetha Chakrabarti* were with him on brief.

*Mark Brnovich*, Attorney General, Office of the Attorney General for the State of Arizona, *Dominic E. Draye*, Solicitor General at the time the brief was filed, *Andrew G. Pappas* and *Keith Miller*, Associate Solicitors General, *Leslie C. Rutledge*, Attorney General, Office of the Attorney General for the State of Arkansas, *Nicholas J. Bronni*, Solicitor General, *Jeff Landry*, Attorney General, Office of the Attorney General for the State of Louisiana, *Elizabeth B. Murrill*, Solicitor General, *Michelle White*, Assistant Attorney General, *Timothy C. Fox*, Attorney General, Office of the Attorney General for the State of Montana, *Dale Schowengerdt*, Solicitor General, *Jahna Lindemuth*, Attorney General, Office of the Attorney General for the State of Alaska, *Ashley Brown*, Assistant Attorney General, *Cynthia H. Coffman*, Attorney General, Office of the Attorney General for the State of Colorado, *Bill Schuette*, Attorney General, Office of the Attorney General for the State of Michigan, *Matthias Sayer*, Special Assistant Attorney General, Office of the Attorney General for the State of New Mexico, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *James Emory Smith*, *Jr*., Deputy Solicitor General, *Sean Reyes*, Attorney General, Office of the Attorney General for the State of Utah, *Tyler Green*, Solicitor General, *Lara Katz*, Special Assistant Attorney General, Office of the Attorney General for the State of New Mexico, *Adam Paul Laxalt*, Attorney General, Office of the Attorney General for the State of Nevada, *Lawrence VanDyke*, Solicitor General, *Marty J. Jackley*, Attorney General, Office of the Attorney General for the State of South

Dakota, *Steven R. Blair*, Assistant Attorney General, *Erik E. Petersen* and *Michael M. Robinson*, Senior Assistant Attorneys General, Office of the Attorney General for the State of Wyoming, *Brad D. Schimel*, Attorney General at the time the brief was filed, Office of the Attorney General for the State of Wisconsin, *Misha Tseytlin*, Solicitor General at the time the brief was filed, and *Luke N. Berg*, Deputy Solicitor General at the time the brief was filed, were on joint brief for State Intervenors' in support of the respondents. *Lee P. Rudofsky*, Solicitor, and *Jamie L. Ewing*, Assistant Attorney General, Office of the Attorney General for the State of Arkansas, *Oramel H. Skinner*, *III*, Solicitor, Office of the Attorney General for the State of Arizona, and Steven C. Kilpatrick, Assistant Attorney General, Office of the Attorney General for the State of Wisconsin, entered appearances.

*Steven G. Barringer* was on brief for the *amici curiae* Alaska Miners Association, et al. in support of the respondents.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In January 2017, acting pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9608(b), the Environmental Protection Agency (EPA) proposed setting financial responsibility requirements for the hardrock mining industry. Financial Responsibility Requirements Under CERCLA § 108(b) for Classes of Facilities in the Hardrock Mining Industry (Proposed Rule), 82 Fed. Reg. 3388 (Jan. 11, 2017). Other federal agencies, state agencies and industry representatives submitted comments opposing the EPA's proposal as unnecessary due to existing

federal and state programs and modern mining practices. The EPA ultimately agreed with the comments and announced in February 2018 that it decided not to issue financial responsibility requirements for the hardrock mining industry. Financial Responsibility Requirements Under CERCLA Section 108(b) for Classes of Facilities in the Hardrock Mining Industry (Final Action), 83 Fed. Reg. 7556, 7556 (Feb. 21, 2018). Following the EPA's announcement, six environmental organizations—the Idaho Conservation League, Earthworks, Sierra Club, Amigos Bravos, Great Basin Resource Watch and Communities for a Better Environment (collectively, "Environmental Groups")—jointly petitioned for review of the EPA's decision, arguing that it is contrary to CERCLA, arbitrary and capricious and procedurally defective. For the reasons set forth *infra*, we deny the petition.

## I. BACKGROUND

The Congress enacted CERCLA as a "response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). CERCLA mitigates the harm caused by industrial pollution by "promot[ing] the 'timely cleanup of hazardous waste sites'" and by "ensur[ing] that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *Id.* (quoting *Consol. Edison Co. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)). Specifically, CERCLA provides the EPA with two mechanisms for doing so. First, the EPA can take "response actions" to address past or impending releases of hazardous substances. 42 U.S.C. § 9604. The EPA initially finances these response actions with CERCLA's Hazardous Substance Superfund (Superfund), *id.* § 9611, after which the EPA can initiate cost-recovery actions against responsible parties, *id.* § 9607(a). Second, the EPA can compel responsible parties, via administrative or

court order, to undertake and finance response actions directly. *Id.* § 9606(a).

To ensure that responsible parties have the wherewithal either to reimburse the Superfund or to finance their own response actions, CERCLA mandates that the EPA require certain classes of facilities identified by the EPA to "establish and maintain evidence of financial responsibility" by obtaining, *inter alia*, insurance, surety bonds or letters of credit. *Id.* § 9608(b). [1] The financial responsibility requirements must be "consistent with the degree and duration of risk associated with the production, transportation, treatment, storage, or disposal of hazardous substances." *Id.* § 9608(b)(1). Moreover, "[t]he level of financial responsibility shall be initially established, and, when necessary, adjusted to protect against the level of risk which the [EPA] in [its] discretion believes is appropriate based on the payment experience of the Fund, commercial insurers, court[] settlements and judgments, and voluntary claims satisfaction." *Id.* § 9608(b)(2). CERCLA instructed the EPA to "identify those classes [of facilities] for which requirements will be first developed" by 1983, prioritizing "those classes of facilities, owners, and operators which the [EPA] determines present the highest level of risk of injury." *Id.* § 9608(b)(1).

Twenty-six years after CERCLA's mandated deadline, the EPA finally announced in 2009, in response to litigation, its decision to prioritize financial responsibility requirements for the hardrock mining industry. Identification of Priority Classes of Facilities for Development of CERCLA Section 108(b) Financial Responsibility Requirements, 74 Fed.

---

[1] CERCLA authorizes the President to issue financial responsibility requirements, 42 U.S.C. § 9608(b), and the President delegated his authority in relevant part to the EPA, Exec. Order No. 12,580, 3 C.F.R. 193, 194, 198 (1988).

Reg. 37,213, 37,213 (July 28, 2009); *see Sierra Club v. Johnson*, No. C 08-01409, 2009 WL 482248, at *10 (N.D. Cal. Feb. 25, 2009). It did not act on its announcement, however, until the Environmental Groups petitioned for a writ of mandamus from this Court directing the EPA to issue financial responsibility requirements for the hardrock mining industry among others. *See In re Idaho Conservation League*, 811 F.3d 502, 506 (D.C. Cir. 2016). While the petition was pending, the parties agreed to a schedule requiring the EPA to issue a proposed rule for the hardrock mining industry by December 1, 2016 and to take final action by December 1, 2017. *Id.* at 506–07. In approving the proposed schedule, this Court emphasized that the EPA "retains 'discretion to promulgate a rule or decline to do so.'" *Id.* at 514 (quoting *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1325 n.7 (D.C. Cir. 2013)).

The EPA published its Proposed Rule on January 11, 2017. 82 Fed. Reg. at 3388. In the Proposed Rule, the EPA reviewed three reports that examined past and present mining practices, evidence of exposure to hazardous substances at mining sites and releases at several recently or currently operating mines. *Id.* at 3471–75. Based on the reports, the EPA found "abundant evidence that hardrock mining facilities continue to pose risks associated with the management of hazardous substances at their sites," *id.* at 3470, and accordingly proposed issuing financial responsibility requirements for the industry, *id.* at 3388.

The United States Department of the Interior's Bureau of Land Management, the United States Forest Service, several state agencies and industry representatives submitted comments opposing the Proposed Rule. *See* Final Action, 83 Fed. Reg. at 7560, 7566. The comments focused on two alleged deficiencies in the Proposed Rule. First, the commenters argued that the Proposed Rule "[r]elied on

inappropriate evidence, such as data that did not demonstrate risk, and evidence not relevant to the facilities to be regulated under the rule." *Id.* at 7560. Second, the commenters urged that the Proposed Rule "failed to consider relevant evidence," including "the role of federal and state mining programs and voluntary protective mining practices in reducing risks at current hardrock mining operations" as well as "the reduced costs to the taxpayer resulting from effective hardrock mining programs, including existing financial responsibility requirements, and owner or operator responses." *Id.* (footnote omitted).

The EPA ultimately agreed with those opposed to the Proposed Rule and announced on February 21, 2018 that it had decided not to issue financial responsibility regulations for the hardrock mining industry. *Id.* at 7556 (Final Action). In particular, the EPA found that existing federal and state programs as well as modern mining practices reduced the risk that the EPA would be required to use the Superfund to finance response actions at currently active mines. *Id.* The EPA also explained in its Technical Support Document to the Final Action why it no longer found persuasive many of the site-specific case studies contained in the reports relied upon in the Proposed Rule. *Id.* at 7581–83; CERCLA Section 108(b) Hardrock Mining Final Rule Technical Support Document (TSD) 1–71. In particular, the EPA observed that (1) some of the sites discussed in the Proposed Rule operated before the development of modern mining regulatory schemes, rendering their "legacy contamination" irrelevant in determining modern mining risks, (2) many of the sites were cleaned up without Superfund expenditures—through either funds from private parties or preexisting financial responsibility obligations—and thus were irrelevant in determining risks of taxpayer funded cleanups and (3) spills at several of the sites occurred as a result of problems since addressed by updated state regulations. *See*

*id.* at 5–6.  The Environmental Groups timely petitioned for review.  *See* 42 U.S.C. § 9613(a) (review must be sought "within ninety days from the date of promulgation").

## II.  ANALYSIS

We have jurisdiction to review regulations the EPA promulgates under CERCLA.  *Id.*  Although it is debatable whether the EPA's Final Action qualifies as a "regulation,"[2] we have jurisdiction under the All Writs Act, 28 U.S.C. § 1651(a), to review the EPA's "withdrawal of a proposed rule . . . in order 'to support [our] ultimate power of review.'" *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 43 (D.C. Cir. 2004) (alteration in original) (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984)).  We may set aside the EPA's Final Action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  We address in turn the Environmental Groups' arguments that the Final Action rests on an incorrect interpretation of CERCLA, is

---

[2] To assess whether agency action constitutes a "regulation," we examine three factors: "(1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545–46 (D.C. Cir. 1999).  The first two factors indisputably cut in favor of finding the EPA's Final Action to be a regulation—the EPA characterized the Final Action as a regulation and published it in the Federal Register, 83 Fed. Reg. at 7556, 7557 n.8.  It is unclear, however, whether the Final Action binds private parties or the Agency because it simply manifests the EPA's decision *not* to promulgate financial responsibility requirements for the hardrock mining industry.

arbitrary and capricious based on the record and is not a logical outgrowth of the Proposed Rule.

## A. Statutory Interpretation

The Environmental Groups mount two statutory challenges. First, they claim that the EPA wrongly interpreted "risk" in the operative provisions of 42 U.S.C. § 9608(b) as limited to the risk of taxpayer funded response actions. Second, they contend that, regardless of the meaning of "risk," CERCLA requires the EPA to promulgate *some* financial responsibility requirements for the hardrock mining industry. We review the EPA's interpretation of CERCLA under the familiar *Chevron* two-step framework, deferring to the EPA's interpretation if (1) the statutory text is ambiguous and (2) the EPA's interpretation of the text is reasonable. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–845 (1984).

### 1. § 9608(b) "Risk"

CERCLA's financial responsibility provision, 42 U.S.C. § 9068(b), includes three clauses that use "risk." First, in the "general mandate clause," CERCLA obligates the EPA to require certain classes of facilities to "establish and maintain evidence of financial responsibility consistent with the degree and duration of *risk* associated with the production, transportation, treatment, storage, or disposal of hazardous substances." 42 U.S.C. § 9608(b)(1) (emphasis added). Second, in the "prioritization clause," CERCLA directs the EPA to prioritize issuing financial responsibility requirements for "those classes of facilities, owners, and operators which the [EPA] determines present the highest level of *risk* of injury." *Id.* (emphasis added). Third, the "amount clause" instructs the EPA to set financial responsibility requirements in the amount necessary "to protect against the level of *risk* which the [EPA]

in [its] discretion believes is appropriate based on the payment experience of the Fund, commercial insurers, court[] settlements and judgments, and voluntary claims satisfaction." *Id.* § 9608(b)(2) (emphasis added).

The parties agree that § 9608(b), by modifying "risk" with "of injury" in the prioritization clause, requires the EPA to consider the risk of harm to human health and the environment in deciding the classes of facilities for which it should prioritize issuing financial responsibility requirements. The Environmental Groups, however, fault the EPA for interpreting the general mandate and amount clauses as not requiring the EPA to account for risks to human health and the environment in deciding whether and to what extent to set financial responsibility requirements, instead requiring only that the EPA consider financial risks, such as the "risk of taxpayer funded response actions." Final Action, 83 Fed. Reg at 7556, 7567, 7568; *accord id.* at 7557, 7562 *see also id.* at 7558 (faulting Proposed Rule for considering "information unrelated to risks of taxpayer financed costs posed by the current facilities to which the proposed rule would apply").[3]

Whether the Congress intended "risk" in § 9608(b)'s general mandate and amount clauses to encompass risks to health and the environment is ambiguous. Neither party disputes that the unmodified term "risk" is ambiguous. The Environmental Groups, however, urge that, because the Congress used the term "risk" in the prioritization clause and other provisions of CERCLA to refer to health and environmental harms, it must have intended to employ the same meaning in the general mandate and amount clauses. The Environmental Groups are correct that "[n]ormally, the

---

[3] Although the EPA maintains that it considered human health and environmental risks in its Final Action, *see* 83 Fed. Reg. at 7570–81, its brief claims that CERCLA did not require it to do so.

same word appearing in different portions of a single provision or act is taken to have the same meaning in each appearance." *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996). The general rule, however, "is defeasible"—that is, "[i]dentical words may have different meanings where 'the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different.'" *Id.* (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). The text of § 9608(b) suggests that the Congress may have intended "risk" to have different meanings in the three clauses. For example, the Congress included the phrase "of injury" to modify "risk" in the prioritization clause but omitted it from the other two clauses. *See* 42 U.S.C. § 9608(b). Indeed, the Congress used only financial terms to modify "risk" in the amount clause. *See id.* § 9608(b)(2) (considering "the payment experience of the Fund, commercial insurers, court[] settlements and judgments, and voluntary claims satisfaction"). Thus, the general rule that terms carry the same meaning throughout a statutory provision may not be applicable to § 9608(b), making the meaning of "risk" in the general mandate and amount clauses ambiguous. CERCLA's general purpose provides no greater clarity. Although CERCLA's primary purpose is to address health and environmental harms resulting from industrial pollution, *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 602, § 9608(b) may nonetheless also serve the narrower purpose of ensuring that the EPA can recover the costs of cleanup from responsible parties.

We believe the EPA's interpretation is reasonable. As noted, the Congress used only financial terms to describe the relevant "risk" in the amount clause. *See* 42 U.S.C. § 9608(b)(2). It is plausible, as the EPA contends, that the Congress intended it to consider the same risks in deciding whether to issue any financial responsibility requirements

under the general mandate clause. The structure of § 9608 supports the EPA's position. Section 9608(a), the immediate predecessor provision, creates financial responsibility requirements for vessels to cover their liability to the EPA in the event of a Superfund-financed cost recovery action. *Id.* § 9608(a). Similarly, § 9608(c), the immediate successor provision, authorizes the EPA to recover cleanup costs by asserting claims directly against the providers of financial responsibility instruments. *Id.* § 9608(c). Although not unambiguous, § 9608(a) and § 9608(c) lend support to the EPA's reading that the financial responsibility requirements promulgated under § 9608 relate only to ensuring against financial risks associated with cleanup costs.

Because § 9608(b)'s use of "risk" in the general mandate and amount clauses is ambiguous and the EPA's interpretation is reasonable, we defer to the EPA's interpretation that it should set financial responsibility regulations based on financial risks, not risks to health and the environment.

### 2. EPA's Decision Not to Regulate

The Environmental Groups next argue that whatever discretion § 9608(b) grants the EPA in setting the amount of financial responsibility requirements, it does not include the decision *not* to promulgate financial responsibility requirements for the hardrock mining industry. The Environmental Groups point to § 9608's use of the obligatory "shall" in instructing the EPA to promulgate financial responsibility requirements. *See* 42 U.S.C. § 9608(b)(1).

The Environmental Groups overstate § 9608(b)'s mandate. Although the provision directs that the EPA "shall" promulgate financial responsibility requirements for certain "classes of facilities," the provision does not specify which classes of facilities. *See id.* The omission leaves discretion

in the EPA to determine the classes of facilities for which it should issue requirements. We said as much in the Environmental Groups' previous mandamus action when we noted that the EPA "retains 'discretion to promulgate a rule or decline to do so'" and that the EPA's decision to undertake a rulemaking "neither resolves the substance of any rulemaking nor even which classes of hardrock mining facilities will be regulated." *In re Idaho Conservation League*, 811 F.3d at 514 (quoting *Defs. of Wildlife*, 714 F.3d at 1325 n.7).

Relatedly, the Environmental Groups argue that the EPA cannot avoid promulgating financial responsibility requirements on the ground that requirements already mandated under other federal and state regulations provide an adequate guarantee of financial accountability. The Environmental Groups assert that § 9608(b)(1) requires the EPA to issue financial responsibility requirements "in addition to" those required under other federal laws. *See* 42 U.S.C. § 9608(b)(1). The phrase "in addition to," however, modifies the types of facilities to be regulated, not the extent of financial responsibility requirements—that is, the EPA may need to promulgate financial responsibility requirements "for *facilities* in addition to those" covered by other federal statutes, *id.* (emphasis added), but the phrase does not place any obligation on the EPA to issue redundant financial responsibility requirements. Consequently, nothing in § 9608(b) mandates the EPA to promulgate financial responsibility requirements for the hardrock mining industry, authorizing the EPA to decline to do so.

## B. Arbitrary and Capricious Challenges

The Environmental Groups next challenge as arbitrary and capricious the substance of the EPA's decision not to issue financial responsibility requirements for the hardrock mining

industry. *See* 5 U.S.C. § 706(2)(A). An agency acts arbitrarily or capriciously if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In reviewing the EPA's decision, we may not substitute our judgment for that of the EPA. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

A major portion of the Environmental Groups' arbitrary and capricious challenge focuses on what they contend is the EPA's failure to account adequately for risks to health and the environment in its Final Action. As discussed, *supra* Section II.A.1, however, we defer to the EPA's interpretation of CERCLA that it need not consider risks to health and the environment in deciding whether to issue financial responsibility requirements. Accordingly, the EPA's alleged failure to consider health or environmental risks, if any, does not render its decision arbitrary or capricious.

The Environmental Groups additionally argue that the EPA arbitrarily and capriciously ignored certain financial risks and that it supported its Final Action with a faulty economic analysis. We are unpersuaded.

### 1. Financial Risks

The EPA explained why it concluded that existing federal and state programs and modern mining practices have obviated the need for new financial responsibility requirements. It first summarized the extensive regulatory requirements other federal programs and the states have developed "over the past

several decades." Final Action, 83 Fed. Reg. at 7571; *see id.* at 7565–67, 7571–80. In particular, it conducted an in-depth review of the mining programs of Nevada, New Mexico, Alaska, Colorado and Montana, which together include approximately 35% of all hardrock mines. *Id.* at 7572–77.[4] In reviewing the state regimes, the EPA found that they have comprehensive regulations governing how mines handle hazardous substances and include their own financial responsibility requirements. *See id.* Although the EPA acknowledged that "the risk of a release is never totally eliminated," it concluded that "substantial advances have been made in the development of mining practices and the implementation of federal and state regulatory programs to address releases at hardrock mining facilities." *Id.* at 7580. Indeed, the EPA found that, of the $12.9 billion spent in response to releases at hardrock mining facilities, only $4 billion came from the Superfund and that the "vast majority" of that $4 billion targeted legacy contamination, not ongoing releases. *Id.* at 7567. Ultimately, the EPA recognized that existing federal and state programs have minimized the need for the EPA's expenditures to respond to "CERCLA-like" releases and have "reduce[d] the risk of federally financed response actions to a low level." *Id.* at 7565–66. The remaining "handful of examples of sites where EPA has incurred response costs, notwithstanding regulation under . . .

---

[4] The EPA also alluded to, but did not discuss, record evidence regarding the "protectiveness" of the regulatory regimes of Arizona, Utah, South Dakota and Idaho. *Id.* at 7572. And the EPA noted that the record included information about other states that further supported its conclusion that existing regulations minimized the need for new financial responsibility requirements. *See id.* at 7567 & n.96, 7577 & n.277 (citing the National Mining Association's comment and report on state regulatory regimes, including the regimes of California, Florida, Michigan, Minnesota, Oregon, Washington and Wyoming); *see also id.* at 7572 & n.157.

state and federal law," the EPA concluded, are not "an appropriate basis for regulation" under § 9608(b). *Id.* at 7567.

The Environmental Groups nonetheless claim that the EPA ignored several relevant financial risks. First, they assert that the EPA failed to analyze all of the financial factors listed in § 9608(b)(2)'s amount clause. The amount clause requires the EPA to consider "the payment experience of the Fund, commercial insurers, court[] settlements and judgments, and voluntary claims satisfaction." 42 U.S.C. § 9608(b)(2). According to the Environmental Groups, the EPA myopically focused on the first of these financial factors—"the payment experience of the Fund"—without addressing the others. We believe the Environmental Groups have misread the record and the EPA's analysis. The EPA credited some commenters' concern that commercial insurers would be unwilling to provide financial responsibility instruments "for the amounts proposed in the forms specified." Final Action, 83 Fed. Reg. at 7583. Moreover, the EPA also expressly considered "payments made pursuant to settlements and voluntary response actions." *Id.* at 7568; *see also id.* at 7567–68 & n.103 (discussing settlement data). It ultimately decided not to issue financial responsibility requirements for the hardrock mining industry in large part because many ongoing cleanup sites are "being paid for by private parties and through existing financial assurance requirements." TSD 15. The EPA's analysis of the record demonstrates that it considered all of the financial factors enumerated in § 9608(b)(2)'s amount clause.

Second, the Environmental Groups complain that the EPA failed to account for the cost of natural resource damage resulting from hazardous substance spills at mining sites. As an initial matter, this objection appears to be an attempt to resuscitate the Environmental Groups' arguments regarding risks to health and the environment—arguments foreclosed by

the EPA's reasonable interpretation of "risk" in § 9608(b), *see supra* Section II.A.1. Regardless, the EPA discussed the role of natural resource damages in setting financial responsibility requirements. Final Action, 83 Fed. Reg. at 7567 n.99, 7569, 7584. It reasonably concluded that "modern regulation of both process discharges and runoff, as well as reclamation requirements to control sources of contamination, significantly address" hardrock mining's "impacts to natural resources." *Id.* at 7569. The EPA thus did not arbitrarily or capriciously ignore costs associated with natural resource damage.

Third, the Environmental Groups contend that the EPA failed to consider that hardrock mining has a higher rate of bankruptcy than most industries and therefore poses a higher risk that abandoned hazardous waste will require long-term remediation efforts. The EPA, however, expressly considered the consequence of bankruptcies in its Final Action. It recounted that states have changed their financial responsibility requirements to account for the risk of bankruptcy and accordingly determined that existing regulations sufficiently account for the risks of long-term remediation efforts. *See* Final Action, 83 Fed. Reg. at 7569, 7577, 7580. We believe its analysis of the risk of bankruptcy was neither arbitrary nor capricious.

As a last note, the Environmental Groups highlight several mining sites for which they believe existing financial responsibility requirements are inadequate. Whatever the merits of the Environmental Groups' concern regarding the sites, it does not undermine the reasonableness of the EPA's decision not to promulgate additional financial responsibility requirements for the entire hardrock mining industry. As noted, the EPA found that only a small fraction of Superfund funds spent on response actions at hardrock mining sites went to address active spills at currently operating mines. *Id.* at

7567. We decline to substitute our judgment for the EPA's on the question whether a handful of sites with likely minimal impact on the Superfund justifies industry-wide financial responsibility requirements. *See id.*; *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416.

## 2. Economic Impact Analysis

The Environmental Groups also argue that the EPA grounded its Final Action on arbitrary economic analysis. "Notwithstanding the absence of a statutory duty, . . . when an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039–40 (D.C. Cir. 2012). We "review such a cost-benefit analysis deferentially." *Id.* at 1040.

We find no "serious flaw" in the Final Action's economic analysis. There, the EPA explained that the Proposed Rule would have cost the hardrock mining industry $111 to $171 million per year "to procure third-party instruments." 83 Fed. Reg. at 7585. But it also predicted that the Proposed Rule would have shifted only $15 to $15.5 million "in annual liability from the federal government to the regulated industry." *Id.* Although the EPA recognized that these two sets of numbers are "not readily comparable," it observed that "the projected annualized costs to industry . . . are a magnitude of order higher than the avoided costs to the government . . . sought by the [Proposed Rule]." *Id.*

The Environmental Groups challenge the EPA's analysis as inflating the costs of the Proposed Rule and ignoring its health and environmental benefits. To start, the Environmental Groups point out that most of the $111 to $171 million the hardrock mining industry would need to expend to

comply with the Proposed Rule represents a transfer of money from the mining industry to institutions providing financial responsibility instruments. Excluding the amount of the transfer, the Environmental Groups explain, would have yielded a net societal cost of only $30 to $44 million, not $111 to $171 million. The EPA acknowledged as much. Final Action, 83 Fed. Reg. at 7585 n.321. Importantly, the Environmental Groups' critique misses the point of the EPA's analysis. The EPA expressly recognized that its estimates of $111 to $171 million in costs to the hardrock mining industry and $15 to $15.5 million in savings to the federal fisc are "not readily comparable." *Id.* at 7585. Its acknowledgement demonstrates that the EPA did not intend to conduct a rigorous societal cost-benefit analysis. Instead, the EPA compared in broad strokes the potential impact of the $111 to $171 million annual bill on the hardrock mining industry—more mine closures and bankruptcies and stunted mining development due to lost capital, *id.*—to the relatively small benefit to the federal fisc. Such a general comparison is reasonable. *Cf. Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 563 (D.C. Cir. 2002) (rejecting claim that "EPA's economic analysis was inadequate because it failed to give sufficient specifics to support the reasonableness of its conclusions regarding economic impact" and noting EPA's "analysis may be general" so long as it explains its reasoning).

The Environmental Groups also complain that the EPA failed to account for two benefits of the Proposed Rule's financial responsibility requirements—(1) greater incentive for the mining industry to follow best practices and (2) quicker responses to hazardous substance releases. As the EPA's analysis elsewhere makes clear, existing federal and state programs impose significant financial responsibility requirements on the hardrock mining industry, *id.* at 7571–80, and thereby already secure these benefits. The EPA therefore

need not have considered these benefits as additional reasons to adopt the Proposed Rule. Reviewing the EPA's economic analysis deferentially, we conclude it is neither arbitrary nor capricious.

## C.  Logical Outgrowth

As a last resort, the Environmental Groups contend that we should vacate the Final Action because it is not a "logical outgrowth" of the Proposed Rule. To satisfy the Administrative Procedure Act's notice requirement, 5 U.S.C. § 553(b)(3), an agency's final action must be a logical outgrowth of its proposed rule. *E.g.*, *CSX Transp., Inc. v. STB*, 584 F.3d 1076, 1079 (D.C. Cir. 2009). "A final rule qualifies as a logical outgrowth 'if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" *Id.* at 1079–80 (quoting *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004) (per curiam)). On the other hand, a final rule is not a logical outgrowth if "interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule.'" *Id.* at 1080 (alteration in original) (quoting *Int'l Union, United Mine Workers of Am. v. MSHA*, 407 F.3d 1250, 1259–60 (D.C. Cir. 2005)).

Under Circuit and Supreme Court precedent, the EPA's Final Action not to adopt financial responsibility requirements for the hardrock mining industry constitutes a logical outgrowth of the Proposed Rule because "[o]ne logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step," *New York v. EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005) (per curiam) (quoting *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C. Cir. 1989)); *accord Long Island Care at*

*Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007) ("Since the proposed rule was simply a proposal, its presence meant that the Department was *considering* the matter; after that consideration the Department might choose to adopt the proposal or to withdraw it. As it turned out, the Department did withdraw the proposal . . . . We do not understand why such a possibility was not reasonably foreseeable."). That the EPA might choose not to promulgate financial responsibility requirements for the hardrock mining industry has always been a foreseeable possibility; our decision in the Environmental Groups' previous mandamus action expressly recognized that the EPA "retains 'discretion to promulgate a rule or decline to do so.'" *In re Idaho Conservation League*, 811 F.3d at 514 (quoting *Defs. of Wildlife*, 714 at 1325 n.7).

Kicking against the goads, the Environmental Groups maintain that even if the EPA's *decision* not to promulgate financial responsibility requirements for the hardrock mining industry is a logical outgrowth of the Proposed Rule, its *reasons* for changing course are not. Specifically, the Environmental Groups urge that the Proposed Rule did not put interested parties on notice that the EPA intended to embrace a new construction of "risk" in § 9608(b) or to "dramatically narrow[] the evidence it deemed relevant." An agency's decision to withdraw a proposed rule ordinarily stems from a changed view of the governing law or underlying facts. *See, e.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. at 163–65 (Labor Department decided not to adopt proposed rule because of changed interpretation of governing statute); *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1286 (D.C. Cir. 2000) (EPA chose not to adopt proposed rule due to intervening issue regarding tribal immunity). Such a changed view does not alter whether an agency's decision to withdraw a proposed rule is a logical outgrowth of the proposal. *See, e.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. at 175; *Ariz. Pub. Serv.*

*Co.*, 211 F.3d at 1299. The Proposed Rule contained the EPA's preliminary interpretation of § 9608(b) and its understanding of the data regarding hazardous waste produced at hardrock mining sites. 82 Fed. Reg. at 3389, 3400. It adequately put interested parties on notice that the EPA was planning regulatory action that might, as happened, not materialize.

For the foregoing reasons, the Environmental Groups' petition is denied.

*So ordered.*